



EXHIBIT 11

# PLANET DEPOS
We make it >> happen.

## Transcript of **DAVID ANTHONY CROSS**

**Date:** July 9, 2013

**Case:** CROSS, ET AL v. PROSPECT MORTGAGE, LLC

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Court Reporting | Videography | Videoconferencing | Interpretation | Transcription

```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      Richmond Division

 4     --------------------------------x

 5     DONNA JOHANSEN CROSS, et al.,   :

 6                        Plaintiffs,  :  Civil Action No.

 7       v.                            :  1:12-CV-1455

 8     PROSPECT MORTGAGE, LLC,         :

 9                        Defendant.   :

10     --------------------------------x

11

12             Deposition of DAVID ANTHONY CROSS

13                    Tysons Corner, Virginia

14                    Tuesday, July 9, 2013

15                           2:56 p.m.

16

17

18

19

20     Job No.: 40001

21     Pages: 1 - 205

22     Reported by: Alda Mandell, RPR, CRR
```

26

1    Q    So at that point you'd stopped making
2  efforts to refinance the loan; is that correct?
3    A    That's correct.
4    Q    And that's true up until today, right?
5    A    That is true up until today. We did try one
6  refi, and that was with American Portfolio. And I
7  think it was January of this year.
8    Q    And what happened there?
9    A    They turned down the amount. Our
10 attorneys -- Tom was doing the negotiations on that.
11 But that was the only other attempt.
12   Q    Were you trying to get a loan at a lesser
13 balance?
14   A    We were trying to buy it from
15 American Portfolio at what they wanted from Prospect.
16 And we had everything in place ready to go.
17   Q    What American wanted from Prospect?
18   A    What American wanted from Prospect. That is
19 correct.
20   Q    So you were trying to, you said, buy the
21 loan? Refi?
22   A    Right. To take it off American's hands, and

27

1    then we would -- I don't know if it would qualify as a
2    refi, or we would just purchase it outright from
3    Virginia Heritage. We would secure the money from
4    Virginia Heritage, and then they would pay
5    American Portfolio. I don't know how that would be
6    phrased in the --
7        Q    Okay. So you get a loan from
8    Virginia Heritage in order to pay off the loan at
9    American Portfolio at some negotiated price.
10       A    Yes.
11       Q    And then you'd end up with a loan with
12   Virginia Heritage.
13       A    Correct.
14       Q    And do you know what the amount in interest
15   rate would have been?
16       A    The interest rate -- the interest rate was
17   around -- I don't remember exactly. It was around 3.5
18   or lower. It wasn't higher than 3.5, if I remember
19   correctly.
20       Q    Do you recall the loan balance?
21       A    304,000.
22       Q    And does that qualify to be a conventional

28

1    loan?

2        A    Yes, it would.

3        Q    That was your goal?

4        A    Right.  Because 20 percent of the home --
5    the home was worth more than -- what is the right way
6    to put this?

7             In order for Fannie Mae or Freddie Mac not
8    to require mortgage insurance, the house has -- 20 to
9    22 percent of the house has to be paid off.  With the
10   304, it would have been below what the house was
11   assessed at.

12            The house was assessed at 395.  The 304
13   would have put the value at about 77 percent, so there
14   wouldn't have been any mortgage insurance premium.

15       Q    And had Virginia Heritage Bank agreed to
16   that arrangement?

17       A    They were ready to go.  We were approved.

18       Q    Was that a separate loan application?

19       A    Yes.  Well, they used the same information.
20   Separate loan application.

21       Q    So you filled out a separate loan
22   application.

29

1  A   I don't remember if we actually went down
2  there.  I think she ran the numbers off all of Donna's
3  stuff from earlier in 2012.  From June of 2012.
4      She verbally got from us on the loan that
5  the information had not changed dramatically, that
6  everything -- I think maybe they pulled her credit
7  report to make sure that that was okay and there
8  wasn't severe damage done.  And then we were ready to
9  go conventional.
10      (Mr. Wade left the conference room.)
11 BY MR. PERROW:
12  Q   And what's the reason that that didn't
13 happen, again?
14  A   The president of American Portfolio said
15 that was not the number he needs.
16  Q   Did you talk to him, or was that the word
17 you got back from your lawyer?
18  A   That's the word I got back from Tom.  Tom
19 was negotiating it for us.
20  Q   So I'm trying to think what other documents
21 Virginia Heritage would have in connection with this
22 $304,000 loan.

30

1        You said they might have a new credit
2   report.
3        A    Right.
4        Q    Updated credit report.
5             And you're not sure whether you filled out
6   an application or she took one over the phone.
7        A    I don't remember if Donna stopped at Kim's
8   office on the way home from work one day because the
9   times that she would get home varied so much because
10  of traffic.  And she was always tutoring after school
11  or helping out after school.  She never got out of
12  there on time.  So her time getting home would vary.
13            So there wasn't any particular day that
14  sticks out that she got home particularly late because
15  of an appointment she had with Kim.
16       Q    Here's what I want to ask you.  Do you know
17  what a good faith estimate is?
18       A    GFE.  Yes.
19       Q    When you had this arrangement with
20  Virginia Heritage Bank about the 304,000-dollar
21  conventional loan, did they send you a good faith
22  estimate on those -- based on those loan terms?

31

1     A    They might have. I'm sure, if they did,
2 it's in my email file.
3     Q    Okay. Did you produce that to your
4 attorneys?
5     A    I don't remember.
6     Q    Now, I know we're kind of -- we're kind of
7 at the could be/maybe kind of stage here.
8     You're not sure whether you have one or not?
9     A    I'm not sure if I produced it for everybody,
10 or even if I received it.
11     Q    Okay. And you're aware that a lender has an
12 obligation to send you a good faith estimate within
13 three days of making a loan application?
14     A    Right. Okay. I didn't know it was three
15 days.
16     Q    So by the end of January, the idea of the
17 conventional loan at $304,000 had gone away?
18     A    Yes.
19     Q    Just to be clear, we're talking about
20 January 2013.
21     A    I believe so. Yes. I suppose it could have
22 bled into February, but it was definitely the winter,

32

1 and it was right at the turn of the New Year.

2     Q    Since you were not on the loan with

3 Prospect -- strike that. I'm getting ahead of myself.

4     Going back to some of the statements about

5 damages. And I believe there's a statement that your

6 wife's credit rating was being put at risk.

7     A    Right now, yes.

8     Q    Your personal credit rating, however, is not

9 affected by this situation, correct?

10     A    Actually, since this started, I've tanked

11 mine in order to try and preserve hers.

12     Q    What do you mean, you've tanked yours?

13     A    I'm late on payments to my credit to make

14 sure that her credit rating stays up. The house isn't

15 in my -- if we have to do a refi, it is imperative

16 that her credit rating try and stay as good as

17 possible.

18     Q    To whom are you late on payments?

19     A    It is not that I'm maintaining something

20 that's 60 or 90 days over. It's just that one might

21 be 30 or 35 days past.

22     So, I'll skip a payment on, say, one of my

1  Q    Okay.  Of 2012?

2  A    Of 2012.  Yes, sir.

3  Q    It could have been sometime after that is
4 what you're saying, it was still warm?

5  A    Yeah.  It was still warm, and it wasn't
6 October.

7  Q    Excuse me one minute.

8       You may -- I believe you were in the room
9 when Mrs. Cross -- Ms. Cross, your wife, was asked
10 this morning -- and I think she was asked the question
11 by Mr. Perrow.

12      It was about, again, the question of
13 rescinding the loan.  And she was asked if you all --
14 you and Mrs. Cross had made any efforts to come up
15 with the money to sort of -- if you were going to
16 rescind the loan, to give the money back, right?  And
17 she said she knew of no such efforts being made.

18      Do you remember her testimony about that?

19 A    If we tried to rescind the loan already?

20 Q    Well, what is your understanding if you were
21 to rescind the loan?

22 A    If we were to rescind the loan, then we

DEPOSITION OF DAVID ANTHONY CROSS
CONDUCTED ON TUESDAY, JULY 9, 2013

183

1   would go and try and get a new USDA loan.
2       Q    Would you understand that if you rescinded
3   the loan, to put it colloquially, you couldn't just
4   keep the money, you'd have to give the money back; is
5   that correct?
6       A    If we rescind the loan, then, right,
7   somebody has to get whatever they invested into this
8   process back.
9       Q    Let me ask the question this way, sort of as
10  a hypothetical.
11           If I lend you a hundred dollars and we have
12  a misunderstanding of the terms and this loan is
13  totally not what you thought it would be, maybe I want
14  a hundred percent interest or something like that, and
15  you feel it's all fraudulent, and you say, I want to
16  rescind that loan, you would understand that under
17  those circumstances, you would -- if you were seeking
18  to rescind the loan, you would be giving me my hundred
19  dollars back and canceling the loan; is that correct?
20      A    Yeah.  That's what I thought I had answered,
21  that we would get -- we would go and pursue a new USDA
22  loan.

184

1     Q    Okay.

2     A    And then that money would be paid to whoever
3 is holding the deed or the note on the house.  So they
4 would get their money back.

5     Q    You would be getting a new USDA refinance
6 loan?

7     A    It wouldn't be a refinance anymore because
8 we didn't have one to begin with.  Actually be a USDA
9 purchase.

10     Q    What would you be purchasing?

11     A    We'd be purchasing Kelly Road.  712 --

12     Q    Who would be purchasing Kelly Road?

13     A    Whoever is holding the deed at the time.

14     Q    I'm sorry.  You own -- your wife owns
15 Kelly Road, correct?

16     A    Yes, she does.

17     Q    Who would be purchasing Kelly Road from her?

18     A    Donna would be.

19     Q    She would be purchasing it from herself?

20     A    We don't own it.  We owe -- we don't own the
21 deed.  We -- we exchanged -- from what I understand
22 how this worked, we exchanged the deed for the money

185

1  to buy the house. Somebody else holds the note to the
2  property. Is that right?
3       And then if we rescind the loan because the
4  terms were not -- were not as they were represented to
5  us, well, then, we still have to -- I mean, nobody's
6  going -- we don't get the property for nothing.
7  Somebody -- there's real money that paid for real land
8  in Fauquier County, and we would need to secure
9  another loan that would buy whoever's holding the note
10 to the house.
11      Q   And then the question would be, have you
12 done anything to arrange for that loan that you just
13 described?
14      A   The only thing that we've done is when we
15 attempted to buy it from American Portfolio in around
16 January, when it looked like there was a possibility
17 that we could purchase the note from them and they
18 would be free from this.
19      Q   Well, when you say "purchase the note," the
20 amount you were going to pay for the note was
21 approximately $304,000, correct?
22      A   That is correct.

1  Q   And the balance due on the note would
2  actually be something like 370-something thousand
3  dollars, correct?
4  A   That is correct.
5  Q   Now, would you understand, in seeking to
6  rescind the loan, that you can rewrite the terms in
7  that way, or would you understand that you need to
8  basically just rescind the loan and give the money
9  back, if you're seeking to rescind it?
10 A   I don't know how that would work exactly.
11 Q   So when you're saying that you were making
12 efforts to carry out to rescind the loan, what you
13 were saying was you were trying to discount it, to be
14 fair, from, say, 376 to $304,000?
15 A   We were not trying to discount
16 American Portfolio.  Through the course of discovery,
17 Tom found out that American Portfolio was asking for
18 $304,000 from Prospect to buy the loan back from them.
19 So we offered American Portfolio that amount of money
20 to purchase it from them.
21 Q   But aside from your claims of damages and
22 all those sorts of things, the face amount of the loan

187

1  is approximately $376,000, correct?

2      A    That's where it stands right now. Yes.

3          MR. SMALLEY: I don't have anything else.

4          Thank you very much, Mr. Cross.

5          MR. PERROW: Are you going to have anything?

6          MR. SILVA: I have a couple things, but you

7  can go first.

8    FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT

9              PROSPECT MORTGAGE, LLC

10 BY MR. PERROW:

11     Q    Mr. Cross, I'm just going back to an answer

12 you gave when Mr. Saboura was asking you about what

13 happened in 2010. And I believe -- I'm not trying to

14 coach you, I'm trying to paraphrase you. You said

15 what happened in 2010 was not intentional.

16         Do you remember that answer?

17     A    Yes, I do.

18     Q    And that was -- you were answering that

19 question in regard to what happened at the closing?

20     A    Yes.

21     Q    And when you answered that question, what

22 happened with respect to the HUD-1 that was presented